UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

MORGAN L. LAURIE,                    )
                                     )
            Plaintiff,               )
                                     )
      v.                             )      Case No. 16 cv 3287
                                     )
SIERRA INTERNATIONAL, LLC,           )
                                     )
            Defendant.               )

**MEMORANDUM OF MORGAN LAURIE IN OPPOSITION
TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.  INTRODUCTION**

This case arises out of a series of events beginning in December of 2015.  At that time,

Morgan L. Laurie ["Laurie"] worked as a lead worker at the manufacturing facility of Sierra

International, LLC ["Sierra"] in Litchfield, Illinois where she had worked since her high school

days.  Chris Eichelberger ["Eichelberger"], another Sierra lead worker, worked in an area which

was near Laurie's.

Each describes their relationship with one another in 2015 differently.

According to Eichelberger, they began an affair in March of 2015 which centered around

sexual activity which continued to December 20, 2015.

According to Laurie, they were work friends who would socialize away from work along

with co-workers.  In the fall of 2015 they would go visit a co-worker who was convalescing from

a stroke in Carlinville, Illinois.  While on a visit in early December of 2015, they engaged in sex

after consuming a great deal of alcohol.  Later in December of 2015, Laurie resisted his sexual

advances.

What is clear is that by December, 2015:  1) they had engaged in sex; 2) Laurie did not want to have any further sexual relationship with Eichelberger; and 3) he was extremely angry and upset with her rejection.

Laurie claims that in the wake of her rejection of him Eichelberger acted out against her because of her gender through ongoing conduct which lasted until the late spring of 2015.  She claims that his conduct from both a subjective and objective perspective created a hostile work environment for her.

Laurie claims that on at least three separate occasions between January and May of 2016 she informed Sierra's management about Eichelberger's conduct and told its members she was afraid of him.  Sierra, however, was ineffective in addressing her concerns.

Laurie maintains this case pursuant to Title VII of the "Civil Rights Act of 1964" (42 U.S.C. 2000e et.al.) ["Act"].  She alleges that Sierra failed to adequately investigate and address her concerns about Eichelberger's behavior toward her.

Sierra now claims it is entitled to summary judgment for three reasons.  First, Eichelberger's conduct arose as a result of a failed relationship and, accordingly, as a matter of law was not because of sex.  Second, Eichelberger's conduct was not severe enough to create a hostile work environment for Laurie.  Finally, Sierra responded appropriately to Laurie's concerns.

Laurie submits that Sierra's motion should be denied.  As will be more fully explained, it relies upon selective facts and ignores evidence which undermines its contentions.  Moreover, much of the caselaw it cites is dated or not applicable to the facts in this case.

## II.  STATEMENT OF FACTS

**A.  <u>Sierra's Undisputed Material Facts.</u>**

**1)  Material facts which are undisputed.[1]**

With respect to the material facts claimed to be undisputed by Sierra, Laurie agrees that the following facts are undisputed and material except as otherwise shown:  1,2,3,4,5,6,7,8,9,10 (only to the extend that was Eichelberger's testimony), 11 (only to the extent that was Eichelberger's testimony), 12 (only to the extent that was Eichelberger's testimony), 14,15,16 (only to the extent that was the testimony of each), 18 (only to the extent that was Butts' testimony), 19 (only to the extent that was Butts' testimony), 20 (only as to Eichelberger), 21 (only to the extent that was Apps' testimony), 22,23,25,26,27 (only to the extent that Laurie and Eichelberger exchanged numerous texts), 28 (only to the extent that Laurie and Eichelberger exchanged numerous texts), 29 (only to the extent that Laurie and Eichelberger exchanged numerous texts), 30,31,32,33,34,41,44,45,46,47,51,52,54,55,58,59,60, 61,63 (to the extent they at times followed each other), 65,66,72,73,74,75,76,77 (only to the extent that is what Sierra is supposed to do), 78,81,82,83 (only to the extent that is part of what she told him), 84,85 (only to the extent that Voumard would speak to her at her workstation in front of other employees), 86,87,88,91,93 (to the extent that was Voumard's testimony), 94, 95 (to the extent that was Voumard's testimony), 96,97,98,99,100,102,103 (only to the extent that was his testimony), 104 (only to the extent that was his testimony), 105 (only to the extent that was his testimony), 106

---

[1]   As used in this instrument, the term "Laurie's Statement" refers to the statement of additional undisputed facts set forth in subsection B of this section.

(only to the extent that was his testimony), 108, 109,110,111,112,113 (the delay was occasioned

because of a problem with Laurie's email; Ex.6 at DEF000101), 114,115,116,117,124,125,127

(only to the extent that was the testimony of each), 128, 129,130,131,132, and 133.

### 2) Material facts which are disputed.

With respect to the Sierra statement of material facts, Laurie disputes:  17 [see Laurie

Statement of Facts ¶10, 24, 26, 29, 32], 18 [see Laurie Statement of Facts ¶¶26, Laurie Dep.39-

40], 19 [see Laurie Dep.114], 20 (as to Laurie) [see Laurie Statement of Facts ¶32], 21 see

Laurie Statement of Facts ¶29, 32], 24 [see Laurie Statement of Facts ¶32], 48 [see Laurie

Statement of Facts ¶39], 95 [see Laurie Statement of Facts ¶54], 101 [see Laurie Statement of

Facts ¶56], 105 (as to letting her know he was available to her) [see Laurie Statement of Facts

¶¶55, 57, 59, 60], 107,118,119, and 126 [see Laurie Statement of Facts ¶¶59,60, 66, 67, 68, 69].

### 3) Facts which are immaterial.

Laurie asserts that the following facts are irrelevant to the resolution of any material issue

in the instant summary judgment proceeding:  17 (Butts and Apps impressions are immaterial),

35,36,37,38,39,40,42,43, 49 (given the assigned work location of each),

50,53,56,57,62,63,64,67, 68,69,70,71,79,80,89,90,92,102,120,121,122,123,134, and 135.

### 3) Facts which are objectionable.

Laurie objects to number 13 as objectionable hearsay (Rules 801 and 802 of the Fed.

Rules of Evidence).

### B. Laurie's Statement of Additional and Material Undisputed Facts.

**Laurie's Employment with Sienna**

1.     Laurie began her employment with Sierra in April of 2005  while she was still in high

school.  She was hired as an assembler and later was promoted to group leader [Laurie Dep.10].

2.     A group leader is responsible for a work cell at Sierra.  A work cell is an area where a task is performed.  A group leader is responsible overseeing the inspection of parts, making sure materials are available for packaging and the quality and efficiency of the employees in the work cell [Youngless Dep.17-18].

3.     In 2015 and 2016 another group leader in Laurie's work area was Eichelberger [Laurie Dep.9-10].  Eichelberger has been employed by Sierra since 2002 and became a group leader in 2015 [Eichelberger Dep.8-9].

4.     In 2015 and during the first half of 2016 Laurie was the group leader in the Blister Cell at the Sierra plant.  Eichelberger was the group leader of the South Coast Cell.  Those cells were located next to one another.  Separating them was a rack or shelf upon which materials were stored.  From their work areas they could see each other and were steps away from one another [Laurie Affidavit ¶2, Laurie Dep. 11, 13-15, Davis Dep.8-9, Ex.1].

5.     As a part of her job as a team leader in the Blister Cell, Laurie was required to walk to the Elbar Cell and the Skin Pack Cell to check on orders and to make sure that the products of the Blister Cell were being packaged correctly.  To go from the Blister Cell to each of those cells, Laurie would have to walk past the South Coast Cell.  Although the times that Laurie had to go to the Elbar Cell and Skin Pack Cell varied, it was not unusual for her to walk to those cells and back as much as twenty times a day [Laurie Affidavit ¶3, 4].

6.     Normally, Eichelberger worked from a table which was close to the path Laurie traveled

       in going to and from the Elbar Cell and the Skin Pack Cell.  When she walked past him,

       Laurie would be within ten feet of him [Laurie Affidavit ¶5]

7.     A goal of Sierra was to cross train the group leaders so they could rotate through work

       cells and fill in as needed [Youngless Dep.19].

8.     The group leader of the blister area is in motion most of the time.  The south coast group

       leader is a more stationary position [Youngless Dep.45, Ex.11a].

**Laurie's Relationship with Eichelberger in 2015**

9.     In 2015 Laurie characterized her relationship with Eichelberger as co-workers and

       friends.  Eichelberger is married and has two children.  They did not do things outside of

       work other than with a group of other people.  In 2015 Laurie frequently exchanged text

       messages with Eichelberger [Laurie Dep.15-20, Eichelberger Dep.11].

10.    Laurie did not have a consensual dating relationship with Eichelberger.  Until December

       of  2015 Laurie and Eichelberger were only friends.  She texted him more than anyone

       else during that time period [Laurie Dep.20].

11.    Jose Zuniga, a co-worker, had a massive stroke in September 2015 and was unable to

       return to work.  Laurie and a group of co-workers, including Eichelberger, would visit

       him periodically [Laurie Dep.110].

**The Events in December, 2015**

12.    Laurie and Eichelberger were alone twice when they went to see Jose.  Once in

       December of 2015 and another time later in December of 2015.  Laurie had sex with

       Eichelberger on December 2, 2015 when they went alone.  She does not remember doing

that because she had drank a lot.  Laurie remembers Eichelberger told her it happened.
She remembers going but does not recall what occurred [Laurie Dep.21-23, Ex.1].

13.     On December 3, 2015 Eichelberger told Laurie that they had sex [Laurie Dep.23].

14.     Laurie went to Carlinville, Illinois with Eichelberger a second time in December of 2015
        to visit their friend because she thought someone else was going.  When she found out
        that was not true she said she was not going.  He said he would tell everyone what
        happened the first time.  On the second trip Eichelberger started the sex act but Laurie
        pushed him off.  He was not happy.  He got mad and said he would call her boyfriend and
        claim they had an affair [Laurie Dep.113-114].

15.     On December 7, 2015 Eichelberger by text asked Laurie if she was feeling any better.  In
        her responses later that day to Eichelberger's texts Laurie informed him that:  a) she was
        not someone he was to worry about; b) he should be worrying about his wife and kids; c)
        she did not believe Eichelberger cared about his wife and kids; and d) he was ridiculous
        and should leave her alone.  Eichelberger responded by asking what was her problem
        [Pl.Ex.4].

16.     On December 10, 2015 Eichelberger texted Laurie asking if she was ever going to see
        their friend, Jose, again.  She responded by saying she did not know.  He then indicated
        that Jose would feel that she did not care for him and it would look bad to Jose.  She
        indicated that she was not going to go see Jose for a while and when she did she would
        do it by it herself.  He responded by indicating "you have really got a problem."  When
        Laurie asked him to leave her alone, Eichelberger indicated he would tell Jose she was
        not going to come and see him anymore.  Laurie then indicated to Eichelberger "you are

terrible" [Pl.Ex.4].

17.   Laurie did not tell anyone else she had sex with Eichelberger.  She was ashamed it had

happened [Laurie Dep.24].

18.   On December 20, 2015 Eichelberger texted Laurie and stated he wanted to talk with her.

She responded by saying she had nothing to talk with him about and asked him to leave

her alone.  He indicated in response that he would not leave her alone.  She repeated to

him that she had nothing to talk with him about.  He stated "you are going to talk to me

or I'm calling Matt."  Several minutes later, he texted her stating "I mean it.  You either

answer your phone and talk to me or I call Matt and I will make sure your life is ruined."

She responded by telling him to leave her alone.  He then indicated "I told you you're

going to talk to me or I ruin your life.  I will make sure Matt leaves you."  Laurie then

texted him stating she did not know what his problem is "your life sucks so you think

mine should too."  Later, he texted her stating "I'm done messing around.  I'm calling

him and you'll have nothing when he leaves you.  I will make sure of that" [Pl.Ex.4].

19.   Eichelberger called Matt, Laurie's boyfriend, on the evening of December 20, 2015.

Eichelberger told him that he had been seeing Laurie and Matt should know about it.  At

the time Eichelberger was angry at Laurie [Eichelberger Dep.17-18].

20.   On the morning of December 21, 2015 Eichelberger texted Laurie stating "I bet you had

a great night LOL."  He later texted her and said "you should've talked to me like I said."

Laurie responded by telling him to leaver her alone, calling him a "psycho nutbag" and

accusing him of harassing her.  Later that day, Eichelberger texted her stating "I'm going

to make sure your life is ruined.  Have a nice Christmas." [Pl.Ex.4].

21. Eichelberger and Laurie did not exchange texts after December 22 or 23, 2015. [Eichelberger Dep.48, Ex.2].

22. On December 22, 2015 Laurie initiated a facebook exchange with Eichelberger's wife. In that exchange she stated "I owe u an apology.  What we did was very wrong and should have never happened.  I know this doesn't make it better or anything.  It was a mistake that will never happen again."  She wanted to apologize for what had happened because it was wrong. She felt his wife was owed an apology [Laurie Dep.25-26, Ex.4].

23. According to office notes of Dr. Timothy Ishmael on December 23, 2015 Laurie visited his office to be checked for sexually transmitted infections due to unprotected sex [Def.Ex.5, Laurie Dep.28-29].

**Eichelberger's Conduct Towards Laurie**

24. Prior to December 20, 2015 Eichelberger never told any of his co-workers that he was having any affair with Laurie [Eichelberger Dep.104-105].

25. After December 20, 2015, Eichelberger told others he had an affair with Laurie.  He told people who worked in his area as well as others who did not.  He also told Laurie's boyfriend [Eichelberger Dep.42-44, Apps Dep. 12].

26. Sometime in late December of 2015 or January of 2016, Butts told Laurie that Eichelberger had told her he had an affair with Laurie.  Laurie denied it [Laurie Dep.50-51].

27. On one occasion Julie Devries told Laurie that Eichelberger said he had an affair with Laurie.  Laurie denied it [Laurie Dep.53].

28. On one occasion Jim Komor told Laurie that Eichelberger said they had an affair.  Laurie

denied it [Laurie Dep.54].

29.   Prior to the end of 2015 Heather Apps and Laurie were very good friends.  They texted

every night all night long and confided in one another.  Laurie never told Apps about

having a relationship with Eichelberger.  They talked about Laurie's relationship with her

boyfriend.  Laurie told Apps at times the relationship was good and sometimes they were

fighting.  Typical stuff.  Laurie never told Apps that she was thinking about leaving Matt

[Apps Dep.17-19].

30.   In December of 2015 Apps spoke with Eichelberger.  He asked if Laurie had told her

anything.  Apps said no. Eichelberger told Apps that he called Laurie's boyfriend and

told him what was going on between them.  It was the first time anyone mentioned a

relationship to her [Apps Dep.12-14].

31.   Eichelberger had stopped Apps as she was walking by his work area.  He asked if Laurie

had said anything to her.  He told her they were messing around and had been for a while.

He said he had told Matt, Laurie's boyfriend [Apps Dep.14-15].

32.   After her conversation with Eichelberger Apps told Laurie that Eichelberger told her he

had an affair with Laurie.  Apps asked Laurie if she was sleeping with Eichelberger.

Laurie said no.  Laurie seemed upset and was crying [Apps Dep.21-22, Laurie Dep. 51-

53].

33.   When Laurie returned to work in January of 2016 following the holiday break

Eichelberger would glare at her and watch her.  He would walk out an opposite door and

wait for her in the parking lot.  He then would walk slowly across the parking lot and

watch her [Laurie Dep.33].

34.     After the conversation with Laurie Apps and Laurie spoke multiple times.  Laurie said
        that Eichelberger was following her and complained to Apps about what Eichelberger
        was doing to her [Apps Dep.24].

35.     Beginning in January of 2016, when Laurie walked past the South Coast Cell
        Eichelberger would consistently stare at her with an angry glare on his face.  This
        occurred consistently when she would travel between the Blister Cell and the Elbar Cell
        and Skin Pack Cell.  This behavior on his part continued for a number of months.  It was
        still occurring at the time Laurie talked with Yvan Cote in May of 2016 [Laurie Affidavit
        ¶6].

36.     When Eichelberger glared at Laurie he neither spoke nor tried to touch her.  Laurie never
        gave him an opportunity to speak with her [Laurie Dep.40, 58-59].

37.     Before December of 2015 Eichelberger would be gone from the parking lot before Laurie
        left the building.  After that he walked out of the door and would be waiting in the
        parking lot.  He would walk slowly across the parking lot and watch Laurie walk to her
        car [Laurie Dep.37-38, 45, 84-86].

38.     Prior to the incident in December of 2015, Eichelberger would normally leave the Sierra
        plant at the close of the workday from a different door than the one used by Laurie.
        Normally, he would drive out of the parking lot before Laurie left the plant.  Beginning in
        January of 2016 that changed.  After leaving the plant, Eichelberger, rather than
        immediately driving out of the parking lot, would wait until Laurie exited the plant and
        would then slowly walk to his vehicle [Laurie's response to Def. Int. 6; Def.Ex.3].

39.     One day Laurie pointed out to Karen Davis that Eichelberger had been staring at her.

When she pointed this out Davis turned her head and saw that Eichelberger was staring toward them.  Although there was machinery and material in the way Davis could see that Eichelberger was staring at them.  He stared for at least a couple of minutes.  Laurie told Davis that Eichelberger had been staring her down all day [Davis Dep.9-11, 13-14].

40.   At some point in time after Christmas of 2015 Butts noticed a change in Laurie's interaction with Eichelberger.  Prior to that time Eichelberger and Laurie were always smiling and watching each other.  After Christmas of 2015 Laurie asked Butts to walk her to her car because she was afraid Eichelberger was going to do something to her.  According to Butts, Laurie asked her to escort her to the parking lot where all Sierra employees parked their cars.  That was in late December, 2015 or early January, 2016.  This became a daily occurrence.  Laurie told Butts she was afraid Eichelberger would do something to her [Butts Dep.25-26, 32, 40-41].

41.   The Sierra manufacturing facility is located on the west side of Litchfield, Illinois.  Eichelberger in 2016 lived on the east side of Litchfield, Illinois.  His home was located approximately several miles due east of the plant.  In 2016 Laurie lived in rural Montgomery County, Illinois approximately nine miles north of the Sierra plant [Laurie Affidavit ¶7, Apps Dep.26-27].

42.   One evening in the winter of 2016 as Laurie was driving from work to her home, she noticed Eichelberger's truck behind her.  She first noticed him when she turned onto Route 66 from the Sierra plant.  He continued to follow her as she traveled north through Litchfield, Illinois.  The direction he was traveling would not have taken him to his home.  When Laurie reached the north edge of Litchfield, Illinois, he turned off her route

of travel [Laurie Affidavit ¶8, Laurie Dep. 41-43].

**The Actions of Laurie's Chain of Command**

43.     Scott Voumard is the Director of Operations at Sierra's Litchfield, Illinois facility.  He is

        responsible for its day to day operations [Voumard Dep.7-8].

44.     Thomas Youngless worked at the Sierra facility as its human resources manager

        [Youngless Dep.5, 7-8].

45.     Youngless received no training in sexual harassment or harassment in the workplace.

        The management employees at Sierra do not receive formal sexual harassment or

        harassment training. Normally, if harassment is reported an investigation is done to

        determine the validity of the complaint. The objective is to conduct the investigation soon

        after a complaint is made.  If necessary, the victim is separated from the perpetrator

        [Youngless Dep.23-24, 26, Ex.1].

46.     Voumard has responsibilities for employee work place safety including the abuse of one

        employee by another.  If Voumard had dropped the ball relating to Laurie that could be

        grounds for discipline being taken against him [Voumard Dep.55-58].

47.     Prior to January of 2016 Laurie had never complained to management about how she had

        been treated by other employees [Voumard Dep.11].

48.     Voumard first heard a rumor about a relationship between Laurie and Eichelberger after

        the 2015 Christmas break [Voumard Dep.23-24].

49.     Voumard became aware in early January from Malory Cafarelli, a management

        employee, of something going on between Laurie and Eichelberger.  He understood they

        had ended a relationship [Voumard Dep.18-19, Ex.6].

50.    On January 26, 2016 Eichelberger told Malory Cafarelli that he had been finding business cards from Laurie's boyfriend on his truck.  He asked her to look into it.  A Sierra maintenance supervisor reviewed security camera footage and Malory prepared a letter to Eichelberger [Voumard Dep.20, Ex.6].

51.    No damage was done to Eichelberger's truck by placing the business cards on it.  The truck was parked in the unfenced Sierra lot close to a roadway [Eichelberger Dep.85-87].

52.    Sierra management determined that it was most likely Laurie's boyfriend who did this [Def.Ex.6; May 19, 2016 email from Voumard to Joe Holtschulte].

53.    On January 29, 2016 Voumard spoke with Laurie about a business card left on Eichelberger's truck by her boyfriend.  He indicated that Sierra had done an investigation into the incident, reviewed video footage and noted dates and times that an individual placed the cards on the truck.  He told her that "I do not want this becoming a work issue".  He said what happens outside work was not his business.   He told her not to make it his business by bringing it on company property.  He did not tell Laurie that he had been made aware of potential issues between Eichelberger and Laurie [Voumard Dep.22-23, Ex.6].  At the time of the meeting Voumard did not want bickering and feuding between employees [Voumard Dep.27, Pl.Ex.6].

54.    In mid January of 2016 Laurie first spoke with Voumard regarding Eichelberger. She spoke with him in the print shop next to the blisters cell. She informed Voumard that Eichelberger was telling lies about her which made her feel uncomfortable. Laurie told Voumard that Eichelberger said they had sex, Laurie did not remember it and Eichelberger was telling co-workers.  Laurie told Voumard that was harassment and she

was not comfortable working with that occurring.  The conversation with Voumard lasted
about 10 to 15 minutes. Voumard indicated he would look into the matter [Laurie
response to Def.Int.8; Def.Ex.3, Laurie Dep.60-63].

55.     Between the January meeting and the February 22, 2016 Laurie spoke with Voumard
        every day on the shop floor.  She did not talk with him about problems with Eichelberger
        because they were talking on the floor in the presence of other employees [Laurie
        Dep.68].

56.     Laurie sent Voumard an email on February 22, 2016 asking to talk to him [Laurie
        Dep.66-67, Ex.6].  When they spoke Laurie told Voumard she was afraid of Eichelberger.
        He was glaring at her, waiting for her in the parking lot, hovering around the time clock
        and making her feel uncomfortable.  She told him she had asked Butts to walk her to her
        car.  She initiated the conversation with him because Eichelberger's conduct toward her
        was continuing [Laurie response to Def.Int.9; Def.Ex.3].  Voumard told her to continue
        that practice and use a different time clock.  He never offered to have someone walk her
        to the parking lot [Laurie Dep.70-71, Ex. 6]. According to Voumard, he told Laurie
        during the meeting not to make an issue at work.  He did not want tattling back and forth.
        He told her to stop it [Voumard Dep.25, 32-33, 60].

57.     According to Voumard his work place conversations were short and occurred where
        Laurie worked.  Other people were nearby [Voumard Dep.28-32].

58.     Voumard directed Malory Cirfetelli to tell Eichelberger to stop using the same time clock
        as Laurie and leave work after his shift [Voumard Dep.33-34].  Voumard does not recall
        if anyone checked to see if Eichelberger was complying with the directives [Voumard

Dep.35].

59.   After her conversation with Voumard in February of 2016, Laurie would occasionally
      speak with him in the Stat Room.  These conversations occurred in passing.  Normally,
      Voumard would stand in an open doorway to the room while Laurie was working.
      During these conversations, Laurie would mention that she was still afraid of
      Eichelberger and did not trust him.  Voumard promised to look into the matter.
      Typically, these conversations did not last longer than five minutes [Laurie response to
      Def.Int.10; Def.Ex.3].

60.   Every time Voumard initiated a conversation with Laurie, it would normally take place
      on the work floor in the presence of other employees.  During these conversations, he
      never specifically asked about Eichelberger.  Because she did not want to speak about the
      Eichelberger issues in the presence of other employees, she replied that everything was
      okay [Laurie response to Def.Int.8; Def. Ex.3].

61.   On May 3, 2016 Laurie sent an email to Yvan Cote, the chief executive officer of Sierra,
      indicating that she would like to have a confidential conversation with him [Pl.Ex.10].

62.   In May of 2016 Laurie spoke with Yvan Cotes, Sierra's chief executive officer.  She
      informed him that Eichelberger was telling people they had sex and that she was scared
      of Eichelberger.  She also informed him that she had spoken with Voumard, but did not
      believe anything had been done by him.  She told him that she had a gun in her car for
      protection [Laurie Dep.75-76].  Cote told Laurie he was going to call Voumard [Laurie
      Dep.76-77].

63.   Voumard became aware Laurie had contacted Cotes when he had a telephone conference

with him on May 19, 2016 [Voumard Dep.43]. During the telephone conference Cotes indicated he received an email from Laurie and contacted her. She expressed concerns about Eichelberger which had not been addressed. According to Cotes, Laurie was crying and upset during the conversation with him. She told him she had a gun in her car [Voumard Dep.42-44].

64.  Voumard did not like it that Laurie went over his head. He thought she should have talked to him before she went to Cotes [Voumard Dep.45].

65.  Cote directed Voumard and Youngless to follow up with Laurie, find out her concern and what was needed to do to address the concern. Voumard and Youngless met with Laurie the day after the telephone conference with Cote [Youngless Dep.36-38].

66.  A meeting on May 19, 2016 took place in Youngless' office. Voumard and Youngless were present. They said they were okay with Laurie going to Cote. She had a right to do so, but wished they could have resolved it. The issue of having a gun in her car was brought up. Youngless said he could fire her for that. She told him she had it for her protection because they were not taking care of the problem. Laurie was informed Voumard and Youngless had talked with Eichelberger but that was none of her business and they did not have to share with her. Laurie told them nothing was changing [Laurie Dep.77-78]. She told them she did not believe that they had talked with Eichelberger because his behavior had not stopped [Laurie response to Def.Int.10; Def.Ex.3].

67.  Laurie told them Eichelberger had followed her on three occasions. They said it was not their problem because it did not have anything to do with work. Laurie told them it started on work property because he would leave from the Sierra parking lot [Laurie

Dep.78-79].

68.   Laurie had a second meeting with Voumard and Youngless in May of 2016. She

repeated to them that she was afraid of Eichelberger. They informed her that they had

spoken with him, but refused to provide any information about that conversation. Laurie

indicated that she did not believe they had spoken with him [Laurie response to

Def.Int.10; Def.Ex.3].

69.   Each of the meetings lasted five to ten minutes [Voumard Dep.54, Youngless Dep.41].

70.   Laurie never told Voumard and Youngless at those meetings that everything was okay.

She was still scared of Eichelberger [Laurie Dep.81, Ex.6].

71.   Laurie told Voumard and Youngless that Eichelberger was starting to leave her alone

because her boyfriend had a conversation with him. By May 20, 2016 Eichelberger was

staying away from her and leaving the parking lot before she left the building [Laurie

Dep.82-83].

72.   According to Youngless employees having problems with each other were put in

different zones. Laurie was trained in other areas. Nothing prevented them from moving

her to another work area [Youngless Dep.48-50].

73.   At sometime proximate to July 18, 2016 Laurie was informed by her supervisor, Anita

Jett, that she was being reassigned as a team leader of the EBags cell. That cell was

located in an entirely different part of the Sierra plant from the South Coast Cell. E-bag

is located in the mezzanine area of the plant. According to Voumard, this was done to

deal with an issue involving the group leader in that group and her support staff. While

working in that cell, Laurie had no contact with Eichelberger [Voumard Dep.61-64,

Laurie Affidavit ¶9, Pl.Ex.9].

74.  On October 18, 2016 Laurie sent an email to Lindsey Garner, a Sierra Vice President and
     General Manager.  She indicated that she was scheduled to rotate back to the Blisters
     area.  She indicated she would like to not have to work near Eichelberger.  She informed
     him that it was less stressful for her coming to work when she is not around him
     [Def.Ex.8].

75.  On October 28, 2016 Laurie sent another email to Garner.  She indicated that she is
     scheduled to rotate back to work in close proximity to Eichelberger and his behavior
     toward her since December has made her uncomfortable [Def.Ex.8].

**Laurie's Reactions to Eichelberger's Behavior**

76.  Timothy Ishmael, M.D., is board certified in family medicine [Ishmael Dep.7].  He began
     treating Laurie in 2001 [Ishmael Dep.7-9].  Ishmael regularly treats patients for mental
     health disorders including post traumatic stress disorder, depression and anxiety [Ishmael
     Dep.57].

77.  Prior to December 23, 2015 Laurie was not treated for anxiety.  On that day she visited
     his office for anxiety.  She also wanted to be checked for sexually transmitted diseases
     due to unprotected sex [Ishmael Dep.64-65, Ex.3].  Dr. Ishmael's nurse practitioner
     prescribed Citalopram, an anti anxiety/anti depressant medication, and Lorazepam, a
     tranquilizer.  It was the first time Laurie was prescribed those medications [Ishmael
     Dep.13- 15, Ex.3].

78.  Laurie was diagnosed with acute episodes of anxiety at the December 23, 2015 visit.  Dr.
     Ishmael does not generally refer someone diagnosed with anxiety to a mental health

professional because that specialty is under served in central Illinois [Ishmael Dep.16-17, Ex.3].

79.  In the fall of 2016 Laurie became aware that her rotation in the EBags Cell was coming to an end and she would be returned to the Blister Cell.  In October of 2016 Laurie sent several emails to Lindsey Garner, the plant manager, expressing her concern about going back to work in that cell [Laurie Affidavit ¶10].

80.  On November 1, 2016 Laurie had an office visit with her primary care physician, Timothy Ishmael, M.D.  At that time, she was very upset.  She believed that she was going to be required to return to the Blister Cell and was fearful of going back to a work area proximate to Eichelberger.  As a result of that visit, she was placed by Dr. Ishmael on a family medical leave [Laurie Affidavit ¶11].

81.  Dr. Ishmael certified Laurie's FMLA leave for PTSD, anxiety and depression starting November 1, 2016. Laurie had not been diagnosed with depression or PTSD prior to the November 1, 2016 note.  She had not been prescribed antidepressant medication prior to 2015 [Laurie Dep.93-95].

82.  On November 1, 2016 Ishmael diagnosed Laurie with PTSD.  PTSD is a group of symptoms that cause dysfunction and relate to a traumatic event, either emotional or physical [Ishmael Dep.34-35, Ex.3].

83.  Laurie told Ishmael that she had had problems with a male co-worker stalking her.  She said it was causing a lot of problems and she had asked him to leave her alone.  Laurie said it was a problem working in close proximity to the co-worker at work [Ishmael Dep.34-36].

84.    The PTSD related to the co-worker and his proximity at work.  Symptoms that lead to Ishmael's diagnosis were Laurie's trouble sleeping, fearfulness, scared, inability to remember things, and anxiousness [Ishmael Dep.37-38].

85.    It did not appear to Ishmael that Laurie's problems would be resolved immediately but rather, over the course of time.  According to Dr. Ishmael,  Laurie was scared, very upset and frightened. She was tearful and shaking, very upset.  Dr. Ishmael had never seen Laurie like this before [Ishmael Dep.41-43].

86.    Patients suffering from PTSD may wait for months until the problem cannot be handled. It reaches a tipping point.  Ishmael thinks that Laurie compensated for months and then decompensated [Ishmael Dep.45-46].

87.    Dr. Ishmael felt Laurie was unable to work [Ishmael Dep.48, Ex.5].

88.    Beginning on November 1, 2016, Laurie began a family medical leave based on a certification from Dr. Ishmael.  She remained on that leave until December 5, 2016.  At the time she began that leave, she was scheduled to leave her position in Ebags and return to her work location near Eichelberger [Laurie Dep.92-97].

89.    When Dr. Ishmael saw Laurie on November 30 Ishmael felt she was still suffering from PTSD but was improved [Ishmael Dep.51].

### III.  STANDARDS WHICH ARE APPLICABLE IN A SUMMARY JUDGMENT PROCEEDING

Rule 56 of the *Federal Rules of Civil Procedure* provides that a motion for summary judgment shall be granted only if the pleadings, depositions, answers to interrogatories and admissions on file together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law [*Celotex v. Catrett*,

477 U.S. 317, 91 L.Ed.2d 265 (1986)].

Summary judgment is only appropriate when the record reveals that no reasonable jury could find for the non-moving party [See *Karazanos v. Navistar International Transportation Corp.*, 948 F.2d 332 (7th Cir.1991); *Konowitz v. Schnadig Corporation*, 965 F.2d 230 (7th Cir. 1992); *Anderson v. Stauffer Chemical Company*, 965 F.2d 397 (7th Cir.1992); and *McCoy v. WGN Continental Broadcasting Company*, 957 F.2d 368 (7th Cir.1992)].  It is proper only if there is no reasonably contestable issue of fact which is potentially outcome determinative.  Rule 56 was not intended to permit a summary judgment proceeding as a substitute for a trial [*Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396-97 (7th Cir.1997)].

In a summary judgment proceeding the facts and inferences drawn from underlying facts must be viewed in a light most favorable to the party opposing the motion [See *United States v. Diebold, Inc.*, 369 U.S. 654, 8 L.Ed.2d 176, 82 S.Ct. 993 (1962); and *Matsushita Electric Industrial Company, Ltd., et.al. v. Zenith Radio Corporation*, *et.al.*, 475 U.S. 574, 89 L.Ed.2d 538, 106 S.Ct. 1348 (1986)].

In a summary judgment proceeding, it is not the court's function to weigh the evidence and determine the truth of the matter, but instead to determine whether there is a genuine issue for trial.  A Court should not determine whether the evidence unmistakably favors one side or the other, but to instead determine whether a fair minded jury could return a verdict for the party opposing the motion on the basis of the evidence presented [See *Anderson v. Liberty Lobby, Inc.* (op.cit.1985); and *Shager v. Upjohn Company*, 913 F.2d. 398 (7th Cir. 1990)].  If evidence is subject to conflicting interpretations or if reasonable people might differ as to its significance summary judgment must be denied [See *Egger v. Phillips*, 669 F.2d 497 (7th Cir. 1982); and

*O'Connor v. Chicago Transit Authority*, 985 F.2d 1362 (7th Cir.1993)].

Summary judgment is only to be granted if the record before the court had it been the record of a complete trial would have entitled the defendant to a directed verdict [See *Sarsha v. Sears, Roebuck and Company*, 3 F.3d 1035 (7th Cir.1993); *Robinson v. PPG Industries, Inc.*, 23 F.3d 1159 (7th Cir. 1994); *CSX Transport, Inc. v. Chicago & North Western Transportation Company, Inc.*, 62 F.3d 185, 188 (7th Cir.1995); and *Illinois Conference of Teamsters v. Steve Gilbert Trucking*, 71 F.3d 1361 (7th Cir.1993)].

When the story line of the parties diverge, a court must give credence to the one advanced by the party opposing summary judgment because the evidence must be viewed in the light most favorable to her [*Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir.2016)].

## IV.  ARGUMENT

In order to survive summary judgment with respect to her hostile environment claim, Laurie must present evidence which demonstrates the existence of a fact issue with respect to each of the following propositions:  a) her work environment was both objectively and subjectively offensive; b) Eichelberger's conduct was because of her gender; c) his conduct was either severe or pervasive; and d) there is a basis for employer liability [*Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir.2014); and *Nichols v. Michigan City Plant Planning Department*, 755 F.3d 594, 600 (7th Cir.2014)].

With respect to conduct directed at a plaintiff by a fellow employee, an employer is responsible for his acts of sexual harassment in the workplace if it:  a) knows or should have known of his conduct; and b) fails to take immediate and appropriate corrective action [29 C.F.R. 1604.11 (d); *Rhodes v. Illinois Department of Transportation*, 359 F.3d 498, 505-506 (7th

Cir. 2004); and *Zimmerman v. Cook County Sheriff's Department*, 96 F.3d 1017, 1018-1019 (7th Cir. 1996)].

### A)  Eichelberger's Conduct Toward Laurie Was Because Of Her Sex.

Sierra correctly observes that for claims of sexual harassment to be actionable under the Act, the conduct at issue must manifest some sexual purpose or character.  It then asserts that Eichelberger's conduct was based on animosity arising out of a failed romantic relationship and as a matter of law in our Circuit it could never be based on sex.  Its view is wrong both on the law and the facts in this case.

First, the law.

Sierra relies upon both *Huebschen v. Department of Health and Social Services*, 716 F.2d 1167 (7th Cir.1983) and *Galloway v. General Motors Service Parts Operations*, 788 F.3d 1164 (7th Cir.1996) in support of its proposition that harassment in the wake of a failed romantic relationship can <u>never</u> be because of sex.  To the extent that was ever the law in our Circuit it has been discarded.

The Court in *Keppler v. Hinsdale Township High School*, 715 F.Supp.862 (N.D.Ill 1989) did not read *Huebschen* for the proposition that once an employee engages in a consensual sexual relationship she forfeits her rights to legal protection.  It noted that *Huebschen* "made clear that a hostile environment claim remains available after a consensual sexual relationship comes to an end" (p.868).  Instead, it read *Huebschen* to at most create a rebuttable presumption that the misconduct was not created because of gender, but instead because of failed interpersonal relationship.  Such a presumption can be rebutted with evidence that the perpetrator demanded a further sexual relationship before engaging in the claimed misconduct

(pp.868-869).

Similarly, courts in our Circuit have not read *Galloway* as claimed by Sierra.

The Court in *Walko v. Academy of Business and Career Development*, LLC, 493 F.Supp.2d 1042 (N.D.Ill.2006) did not read *Galloway* as does Sierra.  It reasoned that *Galloway* "simply acknowledges that the prior relationship between the harasser and the victim is a factor to consider in analyzing whether the discrimination was based on sex."  Each case will turn on its own facts (p.1041).

Judge Shadur stated as follows:

"At the outset, it is plain that *Galloway* does not stand for the proposition as a matter of law that an employee cannot recover on a sexual harassment claim merely because she had in the past entered into a consensual relationship with the harasser (see, e.g., *Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1201 (11th Cir.2001); *Babcock v. Frank*, 729 F.Supp. 279, 288 (S.D.N.Y.1990)).14 Indeed, the discussion in *Galloway* itself shows that. If it were really true that a prior relationship created a per se bar to recovery under Title VII for sexual harassment, *Galloway* could readily have said so, rather than engaging in a lengthy discussion of the non-gendered nature of the term "bitch" and on the limited frequency and severity of the sexual harassment at issue there. And to demonstrate even more conclusively that the snippet of language from *Galloway* is a weak reed on which Academy places too much weight, in the post-Galloway case of Johnson v. West, 218 F.3d 725 (7th Cir.2000) our Court of Appeals made it plain that even if the employee-victim and the supervisor-harasser had earlier been involved in a consensual relationship, that does not excuse the harassment that the victim endured once that relationship was dissolved.
It cannot be gainsaid that at least under circumstances such as those presented here, the universal rule that Academy seeks to draw out of *Galloway* is not only at war with Ellerth's teaching but is truly outrageous as a matter of principle. As *Perks v. Town of Huntington*, 251 F.Supp.2d 1143, 1157 (E.D.N.Y.2003) has explained:
'Boiled down to its essence, [that] argument would mean that once a supervisor has engaged in a consensual relationship with an employee, he subsequently has carte blanche to harass that employee with impunity, even though the same behavior with respect to any other employee would constitute a Title VII violation'" (pp.1048-1049).

The Courts in *Johnson v. West*, 218 F.3d 725, 730 (7th Cir.2000); *Babcock v. Frank*, 729 F.Supp. 279 (S.D. NY 1990); and *Pipkins v. City of Temple Terrace, Florida*, 267 F.3d 1197 (11th Cir.2001), did not follow the bright line principle espoused by Sierra.  For example, our Circuit in *Johnson* viewed the prior consensual sexual relationship of the perpetrator and victim to be inconsequential.  It was the behavior "after the 'relationship' dissolved" that was pertinent (p.730).

Second, the facts.

Under Laurie's version of the facts, there was no consensual, romantic relationship between Eichelberger and herself.  In this summary judgment proceeding her view is significant.  When the story line between the parties diverges, a Court must give credence to the one advanced by the party opposing summary judgment because the evidence must be viewed in the light most favorable to her [see *Ortiz* at p.760].

The evidence presented by Laurie indicates that she was a work friend of Eichelberger's.  They would occasionally socialize away from work with a group of other friends [¶9 of Laurie's Statement].  On December 2, 2015 they drove together to visit a friend who was convalescing from a stroke in Carlinville, Illinois.  On the trip they had a great deal to drink and Laurie does not remember the details of the trip.  The following day Eichelberger told her they had engaged in sex on that trip.  Later that month, Laurie was tested for sexually transmitted diseases because she had engaged in unprotected sex [¶12,13,23 of Laurie's Statement].

Sometime later in December of 2015, Laurie reluctantly went with Eichelberger to visit their friend.  Initially, she thought others would be going with them.  When she found out they would be alone, she tried to back out of the trip.  Eichelberger threatened to spread the word they

had engaged in sex if she refused to go with him.  In the face of that threat, she gave in and went with him [¶14 of Laurie's Statement].  During the second trip, Laurie resisted Eichelberger's sexual advances.  He became angry and threatened to call Laurie's boyfriend and tell him they were having an affair [¶14 of Laurie's Statement].  Shortly thereafter, Eichelberger, because he was angry with Laurie, did just that [¶18 of Laurie's Statement].

Text messages exchanged between Eichelberger and Laurie between December 7 and 22, 2015 indicate that:  1) Laurie was trying to avoid Eichelberger; and 2) because of her resistance, he was threatening her [¶15,16,18,20,21 of Laurie's Statement].

Although Eichelberger has a differing version of his relationship with Laurie, he acknowledges it was based on sex.  According to him, they began texting one another in the spring of 2015.  At about the same time, they were visiting Jose Zuniga, a co-employee who was convalescing in a nursing home in Carlinville, Illinois.  Their texts became more intimate and they began having sex when they traveled together to visit Zuniga [Eichelberger Dep.19-22].  Every time Eichelberger and Laurie had sex, it coincided with a visit to Zuniga [Eichelberger Dep.24].  Between March and October of 2015, the relationship consisted of sex and texting.  According to Eichelberger, sex was an essential part of their relationship which continued to December 20, 2015 [Eichelberger Dep.26].

Under either version, a reasonable trier of fact could conclude that Eichelberger's bad behavior began after he was informed by Laurie that she did not want to have sex with him.

If *Galloway* is read the way as Judge Shadur did in *Walko*, a jury, should it buy Eichelberger's claim that he had a consensual sexual relationship with Laurie, would not be obliged under the law to find against her.  Rather, it would merely be a factor it could consider in

determining whether his conduct was based on sex.

### B)  Eichelberger's Conduct Was Sufficiently Severe or Pervasive To Create An Abusive Or Hostile Work Environment For Laurie.

Conduct which is sufficiently severe or pervasive so as to alter the conditions of a plaintiff's employment and create an abusive working environment violates the Act *[Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 91 L.Ed.2d 49 (1986)].

In order for conduct to be actionable it must create for the victim a work environment that it is both objectively and subjectively hostile or abusive.  In other words one that the victim believed was hostile or abusive and also one which a reasonable person would so believe *[Harris v. Fork Lift Systems, Inc.*, 510 U.S.17, 21-22, 126 L.Ed.2d 295 (1993); and *Faragher v. City of Boca Raton*, 524 U.S.775, 141 L.Ed.2d 662 (1998)].

Whether an environment is sufficiently hostile or abusive is determined by "looking at all the circumstances," including:  a) the frequency of the conduct; b) its severity; c) whether it is physically threatening or humiliating (rather than a merely offensive utterance); and d) whether it unreasonably interferes with an employee's work performance [*Harris* at 23].

The point at which a work environment becomes objectively hostile or abusive is not dependent on any "mathematically precise test" [*Harris* at 22].  Instead, the objective severity of the harassment should be judged from the perspective of a reasonable person in the plaintiff's position,  considering "all the circumstances" [*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S.75, 81, 140 L.Ed.2d 201 (1998) quoting *Harris* at 23].

In considering whether conduct is sufficient to create a hostile work environment several points need be kept in mind.

First, the conduct need not be both severe and pervasive.  One sufficiently severe incident is enough.  On the other hand separate incidents not individually severe can create a hostile environment because of their frequency [*Nichols* at p.601; and *Jackson v. City of Racine*, 474 F.3d 493, 499 (7ᵗʰ Cir.2007)].

Second, whether the objectionable conduct is actionable should be looked at from the totality of the circumstance.  Each individual event should not be analyzed by itself to see if it rises to the level of being severe or pervasive [*Nichols* at p.601; and *Hall v. City of Chicago*, 713 F.3d 325, 331 (7ᵗʰ Cir.2013)].

Third, the highly fact specific nature of hostile environment claims makes it difficult to draw meaningful contrasts between one case and another for purposes of distinguishing between sufficiently and insufficiently abusive behavior.  The fact that conduct in one case, when considering all the circumstances, fails to create a hostile work environment does not establish a rule of law that similar behaviors in another context would lead to the same conclusion [*Sciano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 606 (2d Cir.2006); and *Billings v. Town of Grafton*, 515 F.3d 39, 49 (1ˢᵗ Cir.2008)].

A reasonable jury considering "all of the circumstances" could find that Eichelberger's conduct created an objectively abusive or hostile work environment for Laurie.

As early as December 7, 2015, shortly after Laurie claimed she rejected his sexual advances, she made clear to Eichelberger that she wanted him to leave her alone [¶15 of Laurie's Statement].  Eichelberger was not dissuaded.  On December 10, 2015 he tried to guilt Laurie into visiting with him their sick work colleague.  Laurie again asked him to leave her alone [¶16 of Laurie's Statement].  On December 20, 2015 Eichelberger in a text to Laurie told her he wanted

to talk to her.  She told him no.  At that point, Eichelberger in multiple texts threatened to call

her boyfriend and "make sure your life is ruined."  Laurie told Eichelberger not to text her again

[¶18,19 of Laurie's Statement].

Eichelberger admits he was angry.  He called Laurie's boyfriend and told him they had

an affair [¶19 of Laurie's Statement].  On December 2,1 2015 he again texted Laurie.  He said to

her he bet she had a great night (an apparent reference to her boyfriend's reaction to his call) and

told her that she should have talked to him.  When Laurie again told him to leave her alone,

Eichelberger responded by texting:  "I am going to make sure your life is ruined.  Have a nice

Christmas" [¶20 of Laurie's Statement].

To make clear she wanted nothing further to do with Eichelberger, she apologized to his

wife for what they had done [¶22 of Laurie's Statement].

Following the Christmas break at the Sierra plant, Eichelberger began acting out against

Laurie at work.

Initially, he told a number of co-employees that he had an affair with Laurie [¶25-28,30-

32 of Laurie's Statement].  It was so widespread at the Sierra plant that Voumard and other

management employees became aware of the message Eichelberger was spreading [¶48,49 of

Laurie's Statement].

He also began hovering around the time clock  Laurie used at the end of her shift and

loitering in the parking lot waiting for Laurie to leave the Sierra building [¶33,34,37-40 of

Laurie's Statement].  Prior to that time, it was Eichelberger's practice to leave work well before

Laurie left the plant building [¶37 of Laurie's Statement].

Most disturbing, Eichelberger would continually glare at Laurie from his workstation. As a part of her job, Laurie was required to walk past Eichelberger's workstation multiple times each day. Each time he would make a point to glare at her [¶33,35,36,39 of Laurie's Statement].

While his speaking about the affair ended in January of 2016, the remaining conduct continued to at least May of 2016. According to Laurie, it ended only after her boyfriend confronted him [¶35,71 of Laurie's Statement].

Taken collectively, a reasonable person could believe that Eichelberger was angry because of Laurie's rejection of his sexual desires, threatened to ruin her life and through his behavior acted out that threat. In so doing he created a hostile or abusive work environment for her.

A factfinder could also conclude that Laurie believed Eichelberger had created a hostile or abusive work environment for her. In this respect Laurie:  a) on multiple occasions told him to leave her alone [¶15,16,18,20 of Laurie's Statement]; b) requested a co-employee to escort her into the parking lot at the end of her workday [¶40 of Laurie's Statement]; c) told others she was afraid of him [¶40,56,59 of Laurie's Statement]; d) was tearful when talking with others including Sierra's CEO about his behavior [¶63 of Laurie's Statement]; e) complained to management three separate times about his behavior [¶54,56,62 of Laurie's Statement]; and f) facing the prospect of having to return to her old job of working near Eichelberger had an emotional breakdown leading to her physician placing her on a family medical leave [¶73,74,80 of Laurie's Statement].

The cases offered by Sierra in arguing that Eichelberger's conduct did not objectively create a hostile or abusive work environment are unhelpful to it. Each arose in an entirely

different context from Laurie's situation.  For example:  the plaintiff in *Nichols* failed to provide any context for objectionable comments (p.602); the plaintiff in *Whittaker v. Northern Illinois University*, 424 F.3d 640, 644-645 (7th Cir.2005), did not become aware of the objectionable comments until after leaving the defendant's employ; the objectionable staring in *Nuzzi v. Bourbonnais Elementary School*, Dis. 360 Fed.Appx. 664, 666 (7th Cir.2010), consisted of the perpetrator on only one occasion staring at the length of the plaintiff's body during a business meeting; and the objectionable staring in *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-362 (7th Cir.1998), were singular incidents made by three separate co-employees.

Laurie has presented evidence which is different from those cases and would enable a reasonable jury to conclude that Eichelberger's behavior created an abusive or hostile work environment for her.

### C)  Sierra Failed To Adequately Respond To Laurie's Complaints About Eichelberger.

At times relevant to this case, Eichelberger had no supervisory authority over Laurie. Accordingly, Sierra's liability for his conduct arises if it was negligent in discovering and preventing it [see for example, *Baskerville v. Culligan International Company*, 50 F.3d 428, 432 (7th Cir.1995); and *Zimmerman v. Cook County Sheriff's Department*, 96 F.3d 1017, 1018 (7th Cir.1996)].

In supporting its argument that it is not liable to Laurie for Eichelberger's conduct, Sierra makes two points.

First, it claims Laurie "never brought anything forward that would put Sierra on notice of alleged sexual harassment (p.22 of the Sierra brief).  Sierra can be liable to Laurie it is was negligent in discovering his misconduct [*Rhodes* at 506; *Phelan v. Cook County*, 463 F.3d 773,

784 (7th Cir. 2006)].  Negligence in discovering misconduct includes not only what it knew, but also what it should have known [29 C.F.R. § 1604.11(d)].

A reasonable fact finder could conclude that Sierra knew or at the very least should have known that Laurie's complaint about Eichelberger related to sex.

Initially, Voumard knew in early January of 2016 from plant rumors that Laurie and Eichelberger had engaged in a romantic relationship which ended [¶48,49 of Laurie's Statement].  In mid January, 2016 Laurie first approached Voumard complaining about Eichelberger.  She told him Eichelberger was spreading lies about her by telling co-workers they had engaged in sex and she was uncomfortable with this behavior [¶54 of Laurie's Statement].

A reasonable supervisor confronted with that information would conclude that Laurie's complaint both then and later related to sex.

Second, Sierra claims it acted appropriately in responding to Laurie's complaints.

For several reasons, a fair minded jury could find that Sierra's actions in responding to Laurie's complaints were not reasonable attempts to protect Laurie from him.

According to Youngless, the plant human relations director, normally Sierra responds to an harassment complaint by conducting an investigation soon after it is made to determine its validity and, if necessary, separate the perpetrator from the victim [¶45 of Laurie's Statement].

In this case Sierra did neither.

It engaged in no investigation to ascertain the merits of Laurie's complaint.  This failure is in stark contrast to how it responded to Eichelberger's complaint about the business cards of Laurie's boyfriend being left on his truck - an incident causing no harm to him or damage to his property.  With respect to that complaint, Sierra's plant security officer did conduct an

3:16-cv-03287-SEM-TSH   # 24   Page 34 of 36

investigation by reviewing video footage of the parking area and determining dates and times that cards were left and reporting his findings to the plant management [¶50-53 of Laurie's Statement]. Sierra did nothing to investigate Laurie's complaints. It made no effort to observe Eichelberger at his workstation, around the time clock or in the parking lot at the end of the workday.

Second, after Laurie complained to Voumard about Eichelberger a second time on February 22, 2016, nothing was done to separate the two of them. If Laurie's complaint had merit - something which could not be determined without some investigation - it should have been apparent to Voumard that despite what he may have said to him earlier, Eichelberger was not heeding his instructions. The reasonable response at that point would have been to separate them so that they no longer worked in the same area. This is something which, according to Youngless, would be a normal response by Sierra [¶45 of Laurie's Statement]. Inexplicably, this was not done in Laurie's situation.

Sierra offers no excuse for not doing it. According to Youngless, employees having problems with one another were normally placed in different zones. Laurie was cross trained to work in different areas. Youngless concedes that nothing prevented Sierra from moving Laurie to a different work area [¶72,73 of Laurie's Statement].

Ironically, in the summer of 2016 (after Eichelberger's bad behavior ended) Laurie was reassigned to a lead worker position in a different part of the plant where she had no contact with Eichelberger. The reassignment had nothing to do with Eichelberger. Instead, it was because of a relationship problem between the lead worker in that cell and her subordinates [¶73 of Laurie's Statement].

Page -34-

A reasonable jury could question why Laurie was not relocated in the wake of her complaints when a lead worker was later reassigned because she was not getting along with her subordinates.

Finally, a reasonable jury could conclude that Voumard did not take Laurie's complaints seriously and was just "going through the motions."

Voumard knew that Laurie was not a complainer.  Prior to January of 2016, she had never complained to Sierra's management about another employee [¶47 of Laurie's Statement].

Even before Laurie made her complaints to him, Voumard warned Laurie after discovering that there may be issues between Eichelberger and her, that he did not want bickering and feuding between them at work [¶53 of Laurie's Statement].

While Voumard did speak with Laurie frequently after she presented her complaints, the conversations were brief and on the shop floor in the presence of other employees.  Often, it was nothing more than asking her "how is it going?" [¶55,57,59,60 of Laurie's Statement].

## V.  CONCLUSION

Morgan Laurie has presented sufficient reasons to enable a reasonable jury to find in her favor.  For these reasons, she respectfully requests that the motion for summary judgment of the Defendant be denied.

                                             Morgan Laurie

                                             By: s/James P. Baker
                                                    One of Her Attorneys

James P. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield,  Illinois   62701
Telephone:  (217) 522-3445
Facsimile:  (217) 522-8234
E-mail:  jpb@bbklegal.com
(Memorandum/lauriem msj opposition 041718)


## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:


Katherine A. Rodosky
Schueler, Dallavo & Casieri
Email:  krodosky@sdc-atty.com


By: s/James P. Baker
Baker, Baker & Krajewski, LLC